UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAWN HALL, *on behalf of herself and others similarly situated*,

               Plaintiff,

    -against-

CITY OF NEW YORK,

               Defendant.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/28/2023

22-CV-10193 (GHW) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Dawn Hall has worked as a Construction Project Manager at the New York City Department of Housing Preservation and Development (HPD) since May 2018. Compl. (Dkt. 1) ¶¶ 14, 60; Hall Decl. (Dkt. 16-3) ¶ 3. In this action, plaintiff alleges that she and other "similarly situated" employees of the City of New York (the City) are or were subject to the pay policies set by the "1995-2001 Citywide Agreement" (the Citywide Agreement, or Agreement) (Dkts. 1-1, 16-2), and that three of those policies violate the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, by denying employees all of the overtime compensation to which they are entitled. Compl. ¶¶ 1-3, 21-46; Hall Decl. ¶ 4.[1] Apart from the Agreement, plaintiff alleges that the City maintains two additional "unlawful wage practices" that result in the under-payment or late payment of overtime compensation. Compl. ¶¶ 47-59.

Now before the Court is plaintiff's motion (Dkt. 14) for an order conditionally certifying the case as a collective action pursuant to 29 U.S.C. § 216(b); equitably tolling the statute of

---

[1] The Agreement is a collective bargaining agreement (CBA) negotiated between the City and District Council 37, AFSCME, AFL-CIO, for the period January 1, 1995 through June 30, 2001. *See* Ag. at 1. Plaintiff does not explain the mechanism through which the Agreement continues to apply to her and other municipal employees more than 20 years later. However, the City does not deny that it has "employees subject to the Agreement." Ans. (Dkt. 22) ¶ 2; *see also* Def. Supp. Ltr. (Dkt. 39) at 2 (conceding that the Agreement applies to numerous City employees, including workers at the New York Public Library).

limitations; directing that persons similarly situated to plaintiff be given notice of the pendency of this action; and directing production of the names, addresses, email addresses, and phone numbers of those persons so that she can disseminate the notice of pendency. *See* Pl. Mem. (Dkt. 15) at 1, 14-23; Prop. Order (Dkt. 17) at 1-2. Plaintiff also seeks judicial approval of her proposed form of notice and related documents. Pl. Mem. at 17-20. The proposed collective would include all City employees subject to the Agreement "at any time during the full [FLSA] statute of limitations period," across numerous municipal departments, offices, and agencies, and would number "approximately 500,000" individuals." *Id.* at 2, 4.

The motion is "within the scope of my authority under 28 U.S.C. § 636(b)(1)(A)." *Pettenato v. Beacon Health Options, Inc.*, 425 F. Supp. 3d 264, 269 (S.D.N.Y. 2019) (quoting *Sanchez v. Salsa Con Fuego, Inc.*, 2016 WL 4533574, at *1 (S.D.N.Y. Aug. 24, 2016)); *see also Warman v. Am. Nat'l Standards Inst.*, 193 F. Supp. 3d 318, 321 n.1 (S.D.N.Y. June 27, 2016) ("Motions for conditional certification of a collective action under the FLSA are non-dispositive.").

For the reasons set forth below, plaintiff's motion will be granted in part. The City will be required to produce contact information for, and plaintiff will be permitted to send notices to, all Construction Project Managers employed by HPD since December 2, 2019.

## I.   BACKGROUND

### A.   Plaintiff's Claims

Plaintiff alleges that the City unlawfully denies overtime compensation to its employees in various ways, three of which are "outlined in the Citywide Agreement." Compl. ¶ 29. In the sections below, I describe each claimed FLSA violation, as well as the contractual provisions (if any) that govern the challenged policies.

1. **Shift Differentials**

Pursuant to the Agreement, many City employees earn "shift differentials" of 10% for scheduled work performed between 6:00 p.m. and 8:00 p.m. (or, for employees newly hired after July 14, 1996, between 8:00 p.m. and 8:00 a.m.). Compl. ¶¶ 30-31; *see also* Ag. art. III § 1(a).[2] However, plaintiff alleges, the City "does not account for the higher rates of pay earned by Employees as Shift Differentials when calculating Employees' regular rates of pay for the purposes of determining their overtime compensation." Compl. ¶ 35. According to plaintiff, this practice violates the FLSA, which generally requires that overtime be compensated at one and one-half times "the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). Under the FLSA, an employee's "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee." *Id.* § 207(e). Thus, "[t]he [FLSA] requires the inclusion in the regular rate of such extra premiums as nightshift differentials[.]" 29 C.F.R. § 778.207(b).

Plaintiff further alleges that "the Citywide Agreement admits to this unlawful pay practice explicitly." Compl. ¶ 36. The cited provision states: "An employee working overtime shall only receive a shift differential if the employee is receiving straight time cash compensation. In such cases the shift differential shall be calculated separately from the overtime compensation." Ag. art. III § 1(b). It is not clear to the Court that this language "explicitly admits" that the City "does not account for the higher rates of pay earned by Employees as Shift Differentials when calculating Employees' regular rates of pay for the purposes of determining their overtime compensation." Compl. ¶ 35. That issue, however, is not before me on the instant motion.

---

[2] Shift differentials are "applicable to all employees except those in classes of positions certified by the Board of Certification in Decision No. 50-73 . . . and subsequent amendments to said certification." Ag. art. III. Neither party has provided any further detail about the employees excluded by Decision No. 50-73.

### 2.      Compensatory Time

Under the Agreement, certain overtime hours are "banked" as compensatory time rather than compensated in cash. Compl. ¶¶ 39-40; Ag. art. IV § 4(b). "While the FLSA authorizes this practice, any overtime wages that are banked as compensatory time must still be banked at a rate of one and one-half times an employee's regular rate of pay." Compl. ¶ 40; *see also* 29 U.S.C. § 207(o)(1) ("Employees of a public agency . . . may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required[.]"). According to plaintiff, the City "fails to adhere to this legal requirement, instead banking compensatory time at less than one and one-half times Employees' regular rates of pay," even when they have worked more than 40 hours in the relevant week. Compl. ¶ 41.

Although plaintiff describes this policy as one that is "outlined in the Citywide Agreement," Compl. ¶ 29, she does not point to any contractual provision authorizing the City to pay out overtime wages which are banked as compensatory time at less than the one-and-one-half-times ratio prescribed by the FLSA. *See id.* ¶¶ 39-42. To the contrary, the Agreement states:

> Ordered involuntary overtime which results in an employee working in excess of forty (40) hours in any calendar week shall be compensated in cash at time and one half (1-1/2 times).
>
> * * *
>
> *For employees covered by the provisions of FLSA,* voluntary overtime actually worked in excess of forty hours in a calendar week shall be compensated at the rate of time and one-half (1½x) in time provided that the total unliquidated compensatory hours credited to an employee pursuant to this provision may not exceed 240 hours. If an employee has reached the 240 hour maximum accrual for FLSA compensatory time, all subsequent overtime earned under this provision must be compensated in cash at time and one-half (1½x).

Ag. art. IV §§ 3(a), 4(b) (emphasis added).

### 3.      Overtime Cap

The Agreement sets "caps" on overtime. Compl. ¶ 43. If an employee's annual gross salary (including overtime, shift differentials, and any "premium pay") exceeds the cap, "compensatory time at the rate of straight time shall be credited for authorized overtime[.]" *Id.* ¶ 44 (quoting Ag. art. IV § 7(b)) (alteration in original).[3] Thus, plaintiff alleges, once an employee's annual compensation exceeds the cap, he or she "is not paid overtime compensation, even if he or she works more than 40 hours in a single workweek." Compl. ¶ 45.

However, plaintiff does not quote the relevant provision of the Agreement in full. The complete sentence is: "When an employee's annual gross salary including overtime, all differentials and premium pay is higher than the cap, compensatory time at the rate of straight time shall be credited for authorized overtime *except as may be proscribed by FLSA*." Ag. art. IV § 7(b) (emphasis added). The OPA website confirms that "the overtime cap will not apply if the [FLSA] mandates payment for overtime worked[.]" *Frequently Asked Questions About Pay*, NYC Payroll, *supra* n.3.

Apart from the Agreement, plaintiff alleges two additional FLSA violations by the City.

### 4.      Non-Compensable Hours

According to plaintiff, the City "treats certain overtime hours worked as 'Non-Compensable Hours,'" depending on, among other things, whether they "were approved prior to being worked." Compl. ¶¶ 47-48. Plaintiff explains that this violates the FLSA because

---

[3] As of November 28, 1999, the cap was $54,549. Ag. art. IV § 7(e). Neither party discloses the current cap. According to the website maintained by the New York City Office of Payroll Administration (OPA), the cap was increased to $87,860 as of October 26, 2019. *See Frequently Asked Questions About Pay*, NYC Payroll, https://www.nyc.gov/site/opa/my-pay/pay-frequently-asked-questions.page (last visited September 28, 2023).

"[e]mployees are entitled to be paid for all hours for which they suffered or were permitted to work[.]" *Id.* ¶ 50.

### 5.      Late Payment of Overtime Compensation

Finally, according to plaintiff, while defendant "pays Employees straight time wages on time," that is, by the Friday after each bi-weekly pay period, it "does not pay overtime compensation until a full two-week pay period after the overtime work has been performed." Compl. ¶ 52. Plaintiff alleges that this practice violates 29 C.F.R. § 778.106, which states that "overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." Compl. ¶ 101.

Section 778.106 (which is an "interpretative bulletin," and thus provides guidance rather than commanding "formal deference from this Court," *Worley v. City of New York*, 2020 WL 730326, at *9 n.3 (S.D.N.Y. Feb. 12, 2020)) is somewhat more nuanced than plaintiff suggests. The "general rule" is that "overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." 29 C.F.R. § 778.106. "When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable." *Id.* Thus, an employer's liability for late overtime payments "hinges not only on *when* the payments were made, but also on whether the employer took efforts to make the payments 'as soon after the regular pay period as is practicable.'" *Adams v. City of New York*, 2021 WL 1791182, at *8 (S.D.N.Y. May 5, 2021) (quoting *Conzo v. City of New York*, 667 F. Supp. 2d 279, 288 (S.D.N.Y. 2009)) (emphasis in original).

### B.    Procedural Background

Plaintiff Hall filed this action on December 1, 2022. The following week, the Hon. Gregory H. Woods, United States District Judge, referred the case to me for general pretrial management. (Dkt. 7.) On December 12, 2022, plaintiff filed a Consent to Join form signed by another HPD Construction Project Manager, Alexandros Simantiras. (Dkt. 10-1.) Simantiras is, thus far, the only individual who has opted in to this action.

On February 1, 2023, before defendant answered, plaintiff filed her motion for conditional certification, supported by her memorandum of law and the declaration of her attorney, Alex J. Hartzband (Hartzband Decl.) (Dkt. 16), which in turn attaches the Agreement, the Hall declaration, the declaration of opt-in plaintiff Simantiras (Simantiras Decl.) (Dkt. 16-4), various paystubs and other pay records pertaining to plaintiff Hall (Dkts. 16-5 through 16-9), and plaintiffs' proposed notice and consent form to be sent to potential opt-in plaintiffs. (Dkts. 16-10 through 16-13.)

On February 24, 2023, the City timely filed its Answer, and on March 8, 2023 (after seeking and obtaining an extension of the briefing schedule), it timely filed its memorandum of law in opposition to the conditional certification motion (Def. Mem.) (Dkt. 24), as well as the declaration of Sonya Gidumal Chazin (Dkt. 25), attaching a copy of *Lynch v. City of New York*, 2016 WL 11717103 (S.D.N.Y. Dec. 5, 2016). On March 24, 2023, plaintiff timely filed her reply memorandum of law (Pl. Reply Mem.) (Dkt. 28), as well as the reply declaration of attorney Hartzband (Hartzband Reply Decl.) (Dkt. 29), attaching the reply declaration of plaintiff Hall (Hall Reply Decl.) (Dkt. 29-1), and corrected versions of her proposed notice and consent forms.[4]

---

[4] As corrected, the notice and consent forms "state the correct statutory period of December 1, 2019 through the present." Hartzband Reply Decl. ¶¶ 5-8 & Exs. 15-18 (Dkts. 29-2 through 29-5).

On April 24, 2023, I held an initial case management conference and issued an Initial Case Management Order (Case Mgmt. Order) (Dkt. 33), under which fact discovery is scheduled to close on December 8, 2023, and all discovery is scheduled to close on January 19, 2024. Case Mgmt. Order ¶¶ 4-5.

On July 6, 2023, plaintiffs filed a letter (Pl. Supp. Ltr.) (Dkt. 37), attaching a document entitled "Agreement Between the New York Public Library and Local 1930, District Council 37, AFSCME, AFL-CIO" (NYPL Agreement) (Dkt. 37-1), and arguing that the NYPL Agreement further buttresses her motion. Pl. Supp. Ltr. at 2. On July 20, 2023, the City filed a responding letter arguing that the NYPL Agreement provides no new information, because it "has been in effect since September 2017," and because the Citywide Agreement itself already states that it applies to employees of "any museum, library, zoological garden or similar cultural institution for employees whose salary is paid in whole from the City Treasury, pursuant and limited to the election of said cultural institution to be covered by this Agreement." Def. Supp. Ltr. (Dkt. 39) at 2 (quoting Ag. art. I § 1).

## II. DISCUSSION

### A. Legal Standards

The FLSA provides that "any one or more employees" may bring an action against an employer "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To become parties to such an action, employees other than the named plaintiff must opt in by filing written consents in the court in which the action is brought. *Id.* "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537,

554 (2d Cir. 2010) (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)) (alteration in original).

Courts in this Circuit apply a "sensible" two-step method for determining whether to exercise this discretion. *See Myers*, 624 F.3d at 554-55. In the first step – commonly, if somewhat imprecisely, known as "conditional certification" – the named plaintiff must make a "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law,'" *id.* at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)), at which point the trial court may send (or direct plaintiffs' counsel to send) a notice to potential opt-in plaintiffs. *Id.* at 554. At the second stage, which typically occurs after discovery is completed, the court determines whether the plaintiffs who opted in are in fact "similarly situated" to the named plaintiff. *Id.* at 555. If not, the court may "de-certif[y]" the collective and dismiss the opt-in plaintiffs' claims without prejudice. *Id.*

Because the purpose of the first step is merely to "determine *whether* 'similarly situated' plaintiffs do in fact exist," the named plaintiff has a low burden of proof. *Myers*, 624 F.3d at 555 (quoting *Sbarro*, 982 F. Supp. at 261) (emphasis in original); *see also Damassia v. Duane Reade, Inc.*, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006) ("[A] plaintiff's burden at this preliminary stage is 'minimal.'") (quoting *Wraga v. Marble Lite, Inc.*, 2006 WL 2443554, at *1-2 (E.D.N.Y. Aug. 22, 2006)). However, that burden cannot be satisfied solely by "unsupported assertions" in the plaintiffs' pleading, *Myers*, 624 F.3d at 555, or by "conclusory allegations." *Qiang Lu v. Purple Sushi Inc.*, 447 F. Supp. 3d 89, 94 (S.D.N.Y. 2020). Evidence is required. *Id.*; *see also Tlapanco v. City Metal Traders, Inc.*, 2023 WL 2240396, at *2 (E.D.N.Y. Feb. 27, 2023) ("To meet his burden of showing that he is similarly situated, a plaintiff must use pleadings, affidavits, declarations, or other evidence to establish a 'factual nexus' between his situation and that of the

potential opt-in plaintiffs.") (quoting *Fernandez v. On Time Ready Mix, Inc.*, 2014 WL 5252170, at *1 (E.D.N.Y. Oct. 4, 2014)); *Cuaya v. VI Dev. Grp., LLC*, 2020 WL 5494371, at *3 (S.D.N.Y. Sept. 10, 2020) ("[A] plaintiff must offer 'actual evidence of a factual nexus' between his situation and those of other allegedly similarly situated employees.") (quoting *Qing Gu v. T.C. Chikurin, Inc.*, 2014 WL 1515877, at *3 (E.D.N.Y. Apr. 17, 2014)); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying conditional collective certification where plaintiffs "offered no admissible evidence" to support contentions made in complaint); *Prizmic v. Armour, Inc.*, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006) ("[m]ere allegations in the complaint are not sufficient; some factual showing by affidavit or otherwise must be made") (quoting *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000)).

At the conditional certification stage, courts "should not weigh the merits of the underlying claims," *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) (citing *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)), and should not "resolve factual disputes, decide substantial issues going to the ultimate merits, or make credibility determinations." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 158 (S.D.N.Y. 2014) (quoting *Lynch*, 491 F. Supp. 2d at 368). Accordingly, where there is a conflict between the parties as to the facts underlying plaintiffs' wage and hour claims, the court treats plaintiffs' specific factual attestations (though not any unsupported conclusory assertions) as true. *See Cortes v. New Creators, Inc.*, 2015 WL 7076009, at *1 n.1, *2 (S.D.N.Y. Nov. 12, 2015).

In cases involving employees at multiple business locations, courts typically consider "whether the plaintiffs have made an adequate factual showing to support an inference that . . . a uniform policy or practice exists, and whether the locations share common ownership or management." *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 558 (S.D.N.Y. 2013)

(quoting *Hamadou*, 915 F. Supp. 2d at 662); *see also Rosario v. Valentine Ave. Disc. Store, Co., Inc.*, 828 F. Supp. 2d 508, 516-17 (E.D.N.Y. 2011) (collecting cases). Even where common ownership and management are clear, plaintiffs must adduce enough evidence to support an inference of a common "wage policy" across all locations. *See*, *e.g.*, *Trinidad*, 962 F. Supp. 2d at 558-60 (declining to authorize notice to all Pret a Manger restaurant locations in New York City, or even to the full list of locations at which the named plaintiffs had worked, because "plaintiffs have not demonstrated across all locations a uniform policy of failure to pay overtime compensation"); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (conditionally certifying a group of employees at one pizza store, but declining to include employees at five other stores in the same chain where plaintiffs made only "generalized allegations of wrongdoing" regarding one of the stores, supported by hearsay statements of questionable reliability). The same considerations inform the court's discretion in cases involving public employees at multiple departments, offices, or agencies. *See*, *e.g.*, *Lynch*, 2016 WL 11717103, at *4 (conditionally certifying a collective comprising employees working in the Principal Administrative Assistant I and Principal Administrative Assistant II occupations at a specific location operated by the City's Department of Homeless Services (DHS), because plaintiffs' allegations as to the overtime policies employed at other DHS locations were "based on uncorroborated anecdotal hearsay" and thus were "too tenuous to support the existence of a common policy across other DHS locations besides 33 Beaver Street").

### B.      Plaintiff's Factual Showing

Plaintiff began working for HPD as a Construction Project Manager on or around May 21, 2018. Compl. ¶ 14; Hall Decl. ¶ 3. She remained in that position at least through July 2023. Def. Supp. Ltr. at 1. Plaintiff is a non-exempt employee; that is, she is "not exempt from the requirement

that [her] employer pay [her] overtime wages under the FLSA[.]" Compl. ¶ 92.[5] Throughout her

employment, plaintiff has been paid "under the terms of the Citywide Agreement," *id.* ¶ 65, which

governs her "work schedule, rates of pay, and payment of wages." Hall Decl. ¶ 4.

The Agreement also applies, by its terms, to:

i.      Mayoral agency employees subject to the Career and Salary Plan.

ii.     Employees of the Health and Hospitals Corporation with the exception of
        Group 11 employees and interns and residents.

iii.    Employees of the Off-Track Betting Corporation and the New York City
        Housing Authority pursuant and limited to the extent of their respective
        elections to be covered by the NYCCBL [New York City Collective
        Bargaining Law].

iv.     Employees of the Comptroller, the District Attorneys, the Borough
        Presidents, and the Public Administrators, who are subject to the Career and
        Salary Plan, pursuant and limited to the terms of their respective elections
        to be covered by the NYCCBL, and any museum, library, zoological garden
        or similar cultural institution for employees whose salary is paid in whole
        from the City Treasury, pursuant and limited to the election of said cultural
        institution to be covered by this Agreement.

Ag. art. I § 1.

For the most part, the Agreement does not distinguish between exempt and non-exempt

employees. But article IV, which governs overtime pay, specifies that "[i]n the event of any

inconsistency between this Article and standards imposed by Federal or State Law, the Federal or

State Law shall take precedence unless such Federal or State Law authorizes such inconsistency."

Ag. art. IV. Additionally, certain specific pay policies set out in the Agreement apply only to

"employees covered by the provisions of FLSA," or only to "[e]mployees who are not covered by

---

[5] In its answer, the City denies this allegation, Ans. ¶ 92, and asserts, as an affirmative defense,
that plaintiff and others similarly situated are "exempt from the provisions of the FLSA." *Id.* at
ECF p. 11, ¶ 5; *see also id.* at ECF p. 12, ¶ 12 (plaintiff is "exempt from the overtime pay provisions
of the FLSA"). However, the City does not press this point in opposition to plaintiff's conditional
collective certification motion.

FLSA." *See*, *e.g.*, *id.* § 4(b) (governing compensatory time awards for overtime work for "employees covered by the provisions of FLSA"); *id.* § 7(c) (governing time reporting requirements for employees who have exceeded the annual cap, depending on whether they are "covered" or "not covered" by the FLSA). Like most CBAs, the Agreement also contains detailed grievance and arbitration procedures governing disputes "concerning the application or interpretation of the terms of this Agreement." Ag. art. XV § 1. Those procedures are "the exclusive remedy" for the resolution of such disputes. *Id.* § 9.

Plaintiff's normal workweek is 35 hours, from Monday through Friday. Compl. ¶ 62; Hall Decl. ¶ 7. However, she "regularly" works on weekends and after hours "as needed," and as a result often works more than 40 hours in a single workweek. Hall Decl. ¶ 7; *see also* Compl. ¶ 64.

### 1.  Shift Differentials

Plaintiff attests that the Agreement entitles her to a shift differential of 10% for "all scheduled hours I work between 6:00 p.m. and 8:00 a.m." Hall Decl. ¶ 11.[6] She further asserts, in general terms, that the City does not "account for the higher rates of pay I earn as Shift Differentials when calculating my regular rates of pay for the purposes of determining my overtime compensation." Hall Decl. ¶ 12; *see also* Simantiras Decl. ¶ 12 (same). However, neither Hall nor Simantiras points to any specific instance of this alleged violation.

Plaintiff does attest that she clocked in at 6:56 a.m. on July 28, 2020, thus performing slightly more than one hour of work before 8:00 a.m., and provides her corresponding time records. Hall Reply Decl. ¶ 6; Hartzband Decl. Ex. 6 (Dkt. 16-6), at ECF p. 6. As to this hour of work, however, plaintiff complains that she was not paid a shift differential at all: "instead of applying

---

[6] If plaintiff was newly hired after July 14, 1996, she is only entitled to a Shift Differential for "scheduled hours of work between **8:00 P.M.** and 8:00 A.M." Ag. art. III § 1(a)(i) (emphasis in original).

my shift differential for this time worked, Defendant paid me at the same rate for all hours worked during that pay period." Hall Reply Decl. ¶ 8. This claim is not pleaded in the Complaint. Moreover, it arises under plaintiff's CBA, not under the FLSA, and consequently is preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, *et seq. See Hoops v. Keyspan Energy*, 794 F. Supp. 2d 371, 377-80 (E.D.N.Y. 2011) (dismissing FLSA claim alleging that employer failed to pay certain "contractual shift differentials" as preempted by the LMRA, because "any right the Plaintiff may have to receive shift differentials in his straight-time wage rate is derived from the CBA" and outside of the scope of the FLSA); *see also Ramirez v. Riverbay Corp.*, 35 F. Supp. 3d 513, 524 (S.D.N.Y. 2014) (explaining that where the "threshold" dispute is "whether certain contractual shift differentials should have been included in the Plaintiff's straight-time wage rate," it must be resolved "under the grievance procedures in the CBA and the LMRA" before the court can "reach" the question whether those differentials also "triggered [plaintiffs'] right to additional overtime compensation under the FLSA").

As for Simantiras, he cannot identify any date on which worked a full hour or more before 8:00 a.m. or after 8:00 p.m. He explains that since he left HPD on May 15, 2021, he has had difficulty obtaining his pay records. Simantiras Decl. ¶¶ 34-36.

## 2.    Compensatory Time

Plaintiff attests that some of her overtime hours are "banked as compensatory time," but are banked "at a rate less than one and one-half times my regular rate of pay." Hall Decl. ¶ 17. As an example, plaintiff points to the pay period spanning August 2-15, 2020, during which she worked 61.5 hours of overtime, for which the City paid her 12.75 hours of overtime wages. Hall Reply Decl. ¶¶ 11-13; *see also* Hartzband Decl. Ex. 8 (Dkt. 16-8), at ECF pp. 2, 7. For her remaining 48.75 hours of overtime, "Defendant gave [her] only 32.75 hours of compensatory

time," when it should have given her 73.25 hours (one and one-half times the remaining 48.75 overtime hours, rounded to the nearest quarter-hour). Hall Reply Decl. ¶¶ 14-15; *see also* Hartzband Decl. Ex. 7 (Dkt. 16-7) at ECF p. 2 (showing 657 hours of banked compensatory time as of August 7, 2020); *id.* Ex. 9 (Dkt. 16-9), at ECF p. 2 (showing 689 hours and 45 minutes of banked compensatory time as of August 21, 2020). Simantiras similarly attests that some of his overtime hours were banked as compensatory time, "at a rate less than one and one-half times my regular rate of pay," Simantiras Decl. ¶ 17, but provides no specifics.

### 3.   Overtime Cap

Both plaintiff and Simantiras attest that "[i]f" their total compensation exceeded the cap set by the Agreement, they would not paid overtime compensation even if they worked more than 40 hours in a single workweek. Hall Decl. ¶ 20; Simantiras Decl. ¶ 20. They do not claim, however, that either of them ever actually exceeded the cap, or lost overtime wages for that reason.

Significantly, under the express terms of the Agreement, the cap does not apply if "proscribed by [the] FLSA." Ag. art. IV § 7(b); *see also Frequently Asked Questions About Pay*, NYC Payroll, *supra* n.3 ("the overtime cap will not apply if the [FLSA] mandates payment for overtime worked"). At a minimum, therefore, it is unclear whether HPD *would* apply the overtime cap to plaintiff (in which case her overtime hours would be compensated with "compensatory time at the rate of straight time," *see* Ag. art. IV § 7(b)), *if* her total compensation exceeded the specified amount.

### 4.   Non-Compensable Hours

Both plaintiff and Simantiras attest that their employer treats "certain overtime hours" worked by them as non-compensable, including (i) up to "six minutes of time worked," if they clock out within six minutes after the end of their shift; (ii) 30 minutes of their one-hour lunch

break, even if they work through lunch; and (iii) up to 45 minutes of overtime, if they work "less than one hour of overtime during a given week." Hall Decl. ¶¶ 22, 25-29; Simantiras Decl. ¶¶ 22, 25-29.[7]

As an example, plaintiff states that during the pay period spanning August 2-15, 2020, "Defendant treated 14.25 of my hours worked as non-compensable." Hall Reply Decl. ¶ 17; *see also* Hartzband Decl. Ex. 8, at ECF pp. 2, 7. Simantiras does not identify any days on which he worked overtime hours that were deemed non-compensable.

### 5.    Late Payment of Overtime Compensation

Plaintiff is paid bi-weekly, as was Simantiras, with each pay period "spanning two weeks, from Sunday to Saturday," with payment due the following Friday. Hall Decl. ¶¶ 5-6; Simantiras Decl. ¶¶ 5-6. However, the City "routinely" fails to pay earned overtime compensation until the following pay period, "and in many cases far later than that." Hall Decl. ¶ 32; Simantiras Decl. ¶ 32. Both Hall and Simantiras attest that on "many occasions," the City paid their overtime compensation more than a year after it was earned. Hall Decl. ¶ 33; Simantiras Decl. ¶ 33; Hall Reply Decl. ¶¶ 18-21; *see also* Hartzband Decl. Ex. 5 (Dkt. 16-5) (printout of Hall's "paid overtime duty hours," showing both "date earned" and "date paid").[8]

Both plaintiff and Simantiras also attest that, "[t]hroughout the relevant time period, [they] had conversations with other employees who confirmed that they, like [Hall and Simantiras], were denied overtime wages by Defendant." Hall Decl. ¶ 8; Simantiras Decl. ¶ 8. However, no further

---

[7] Under the Agreement, credit for authorized overtime accrues only after the employee has worked "one (1) hour" in excess of 40 in a given calendar week, "except for an employee covered by the provisions of [the] FLSA." Ag. art. IV § 5(a).

[8] Most of the late payments are in extremely small amounts, suggesting that they were the result of an accounting true-up or similar adjustment. For example, plaintiff earned a total of $1,550.75 in overtime during August 2020. Hartzband Decl. Ex. 5, at ECF p. 7. Almost all of it was paid by September 4, 2020, except for the last 96 cents, which was paid on March 5, 2021. *Id.*

information is provided regarding these conversations. Hall and Simantiras do not identify any of the "other employees" to whom they spoke, do not reveal the departments, offices, or agencies where they worked, and do not describe their positions or job duties. Nor do they state whether the "other employees" were deprived of overtime by some or all of the alleged FLSA violations described in the Complaint, or whether they had different complaints entirely.

###   C.   Conditional Collective Certification

Plaintiff argues that the evidence summarized above constitutes a "substantial showing that she and all other [City] employees were subject to [the] same common policy that violates the FLSA." Pl. Mem. at 13. She asserts that the two moving declarations submitted to the Court are supported by Hall's pay records and corroborated by the Agreement itself, which, in her view, shows that "the pay practices Hall and Simantiras experienced at HPD are common across all employees covered by the Citywide Agreement." *Id.* at 14-15. Plaintiff further argues that the Agreement "expressly confirms" several of the "common" pay policies about which she complains, and on that basis urges the Court to conditionally certify a City-wide collective. *Id.* at 15-16.

Plaintiff notes that in the commercial sphere, courts have conditionally certified nationwide collectives where documentary evidence shows that standardized pay practices were applied uniformly at multiple locations, *see*, *e.g.*, *Flood v. Carlson Rests. Inc.*, 2015 WL 260436, at *3-4 (S.D.N.Y. Jan. 20, 2015) (conditionally certifying collective comprising tipped employees across all T.G.I. Friday's locations nationwide because they were all "given the same handbooks with information related to compensation, time-keeping policies, and career development"), and argues that, in this case, the Agreement itself furnishes proof of "pay practices that are common across the entire FLSA Collective – not just common to employees at HPD." Pl. Mem. at 16. However, plaintiff does not point to any previous case certifying a collective of public employees across

multiple job categories and multiple departments, offices, or agencies. Nor has the Court identified

any such precedent. Indeed, although the City has been sued a number of times under the FLSA –

often for the same practices complained of here – where the courts have certified collectives, they

have been confined to a single job category, or a group of closely related job categories, within a

single department, office, or agency.[9]

Defendant contends that an FLSA plaintiff seeking conditional certification must show

"that there are other employees who are similarly situated with respect to the job requirements and

with regard to their pay provisions," Def. Mem. at 5 (quoting *Cunningham v. Elec. Data Sys. Corp.*,

754 F. Supp. 2d 638, 647 (S.D.N.Y. 2010)), and argues that plaintiff Hall has failed to show either

that she is "similarly situated to the putative collective with respect to job duties" or that "there is

a common policy that violates the FLSA." *Id.* As to the first prong, defendant points out that the

proposed collective "encompasses every City employee, subject to the Citywide Agreement, who

was paid overtime and received some type of differential payment," and thus would sweep in

a "myriad of employees," including "individuals in various agencies and entities, performing

---

[9] *See, e.g.*, *Pierre v. City of New York*, 2022 WL 4482295, at *7 (S.D.N.Y. Sept. 27, 2022)
(conditionally certifying collective limited to "NYPD Police Officers, Detectives, Sergeants, and
Lieutenants who performed work through the Paid Detail Program" for specified vendors);
*Campbell v. City of New York*, 2017 WL 3206332, at *7-8 (S.D.N.Y. July 25, 2017) (conditionally
certifying collective limited to peace officers and sergeants at DHS shelters, and further limited to
plaintiffs' uncompensated overtime claims; deferring decision on plaintiffs' claims for overtime
rates that did not incorporate night shift differential pay, miscalculated compensatory time, and
untimely overtime payments, because not all plaintiffs adequately pled such claims); *Hernandez
v. City of New York*, 2017 WL 2829816, at *10 (S.D.N.Y. June 29, 2017) (conditionally certifying
collective limited to fraud investigators at New York City Human Resources Administration);
*Lynch*, 2016 WL 11717103, at *5 (conditionally certifying collective limited to three job categories
at one location operated by DHS). *See also Murray v. City of New York, New York*, 2017 WL
3531552, at *6 (S.D.N.Y. Aug. 16, 2017) (denying motion to conditionally certify collective
including employees in various job categories at various DHS facilities across the City, because
plaintiffs' declarations failed to "make out a minimal showing that similarly situated employees
were subject to a common policy or practice").

various duties, under different supervisors, and working on different shifts." *Id.* at 6-7. As to the second prong, the City argues that the Hall and Simantiras declarations are unacceptably conclusory even as to their own claims, in that "neither of their [moving] declarations point[s] to a specific week during the applicable time-period in which they were injured by the alleged policies," *id.* at 9, and neither provides admissible evidence concerning the pay practices experienced by City employees other than Construction Project Managers at HPD. *Id.* at 10 (noting that plaintiff and Hall did not even have "documentable conversations with[] any other employees regarding compensation practices affecting any employees other than themselves"). Thus, in defendant's view, "if the Court is inclined to grant certification," the collective should be "limited to the HPD and the title of Construction Project Manager." *Id.* at 7.

In her reply brief, Hall takes issue with the two-pronged test described by defendant, arguing that because this is not a misclassification case, she need not show that all putative collective members "performed the same job duties or worked at the same locations." Pl. Reply Mem. at 5. The proper inquiry, plaintiff contends, is whether plaintiff is similarly situated to other proposed collective members "with respect to being subject to the same policy of being denied overtime compensation," *id.* at 5-6 (quoting *Cano v. Four M Food Corp.*, 2009 WL 5710143, at *7 (E.D.N.Y. Feb. 3, 2009)), and whether there is a "factual nexus" among those members as to that policy. *Id.* at 6. That nexus exists here, plaintiff concludes, because of "the Citywide Agreement, which expressly confirms Defendant's unlawful pay practices." *Id.* at 6.

Plaintiff is correct that the "certification question" in this action "is not whether the named and potential opt-in plaintiffs are similarly situated in all factual respects, but rather whether they 'are similarly situated *with respect to their allegations that the law has been violated.*'" *Campbell*, 2017 WL 3206332, at *8 (quoting *Kassman v. KPMG LLP*, 2014 WL 3298884, at *7 (S.D.N.Y.

July 8, 2014)) (emphasis in original); *see also Diaz v. New York Paving Inc.*, 340 F. Supp. 3d 372, 384-85 (S.D.N.Y. 2018) (the fact that the proposed collective included two different jobs, governed by two different CBAs, "does not necessarily mean they are not similarly situated with regard to the alleged unlawful common policy mandating uncompensated overtime before the official work day began and after it ended"); *Cano*, 2009 WL 5710143, at *7 ("As long as [the proposed collective members] were all similarly situated with *respect to being subject to the same policy* of being denied overtime compensation, and there exists a factual nexus among the plaintiffs, conditional certification of the collective action is appropriate") (emphasis in original). Thus, for example, in *Campbell*, the court conditionally certified a collective including both peace officers and sergeants, whose "functional job duties" varied "considerably," but who were "similarly situated in the ways that matter, namely, in how they are scheduled to work and the ways in which they are allegedly required to unlawfully work beyond their scheduled forty hours a week." 2017 WL 3206332, at *8.[10]

Defendant is correct, however, that the named plaintiff has failed to make even a "modest factual showing" that City employees other than HPD Construction Project Managers are "similarly situated in the ways that matter." *Campbell*, 2017 WL 3206332, at *8. First, while plaintiff has submitted admissible evidence in support of her compensatory time claim, her non-compensable hours claim, and her late payment claim, *see* Parts II.B.2, II.B.4, and II.B.5, *supra*,

---

[10] In a misclassification case, by contrast, the named plaintiff must make at least a modest showing that all collective members are similarly situated "with respect to their job requirements" as well as "with regard to their pay provisions," because the underlying FLSA issue – whether or not the employees were properly classified as exempt – depends on both criteria. *Myers*, 624 F.3d at 555; *see also Julian v. MetLife, Inc.*, 298 F. Supp. 3d 699, 702 (S.D.N.Y. 2018) ("in a FLSA exemption case," plaintiffs must show that the proposed collective members are "similarly situated" with respect to both their job requirements and their pay provisions). *Cunningham*, on which defendants rely, was also a misclassification case, in which plaintiffs alleged that defendant "misclassified them as exempt" and on that basis did not pay overtime compensation. 754 F. Supp. 2d at 640.

she provides no such evidence as to her shift differential claim or her overtime cap claim. *See* Parts II.B.1, II.B.3, *supra*. A named plaintiff seeking collective certification must show that she and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (quoting *Sbarro*, 982 F. Supp. at 261). Where, as here, the named plaintiff herself is not a "victim" of the policy she seeks to challenge, she cannot show that she is "similarly situated" to other potential collective members as to those policies. Consequently, no collective can be certified as to plaintiff's shift differential claim or overtime cap claim. *See Han v. Shang Noodle House, Inc.*, 2021 WL 3774186, at *8, *15 (E.D.N.Y. Aug. 24, 2021) (granting collective certification motion as to "alleged overtime violations," but denying motion as to "alleged minimum wage violations," because the named plaintiff's regular rate "exceeded the federal statutory minimum," preventing the court from "find[ing] that Defendants' other workers were similarly situated to Plaintiff with respect to suffering a minimum-wage FLSA violation"); *Marcial v. New Hudson Fam. Rest. Inc.*, 2019 WL 1900336, at *7 (S.D.N.Y. Apr. 29, 2019) (denying motion for conditional certification of FLSA minimum wage claim because plaintiff himself "was paid above the federal minimum wage" and therefore was not "similarly situated to potential class members who were paid below the minimum wage").

Second, as to plaintiff's potentially viable FLSA claims – her compensatory time claim, her non-compensable hours claim, and her late payment claim – she has failed to make the requisite "modest factual showing," *Trinidad*, 962 F. Supp. 2d at 553 (quoting *Myers*, 624 F.3d at 555), that any City employees other than Construction Project Managers at HPD are subject to the practices she challenges. All of plaintiff's evidence concerning these claims relates to her own experience

and that of opt-in plaintiff Simantiras.[11] Plaintiff provides no affidavit or declaration from any employee outside of HPD, and neither plaintiff nor Simantiras claims to have spoken to any identifiable employee outside of HPD about his or her compensation.[12] Instead, both declarants state in the broadest possible language that they had "conversations," at unspecified times, with unidentified employees, working at unspecified departments, offices, or agencies, who "confirmed" that they were in some unspecified manner "denied overtime wages by Defendant." Hall Decl. ¶ 8; Simantiras Decl. ¶ 8.

To describe this testimony as "overbroad and conclusory in nature" would be charitable. *See Murray*, 2017 WL 3531552, at *5 (denying certification where plaintiffs' declarations used "overbroad, virtually identical language to describe why the declarants believe that similarly situated employees have been denied the protections of the FLSA"); *Lynch*, 2016 WL 11717103, at *4 (declaration from shop steward that employees at other DHS locations "have told [her] that their overtime is not being calculated and/or paid correctly, and they have requested that the union investigate the matter," was "too tenuous to support the existence of a common policy across other

---

[11] Both Hall and Simantiras attest that they were paid less than time-and-a-half in banked compensatory hours for their overtime work, and Hall has submitted pay records that appear to support her claim with respect to a specific pay period. *See* Hall Decl. ¶ 17; Hall Reply Decl. ¶¶ 11-15; Simantiras Decl. ¶ 17; Hartzband Decl. Exs. 6-9. Similarly, both Hall and Simantiras attest that HPD treats certain overtime hours actually worked by Construction Project Managers as "noncompensable," and Hall's pay records appear to support that claim. *See* Hall Decl. ¶¶ 22-29; Simantiras Decl. ¶¶ 22-29; Hartzband Decl. Exs. 6, 8. Finally, both Hall and Simantiras attest that HPD Construction Project Managers are sometimes paid their overtime wages months after those wages are earned, and, once again, Hall has submitted corroborating pay records. *See* Hall Decl. ¶¶ 32-33; Simantiras Decl. ¶¶ 32-33; Hall Reply Decl. ¶¶ 18-21; Hartzband Decl. Ex. 5.

[12] There is thus no evidence in the record suggesting that anyone other than Construction Project Managers at HPD were denied overtime pay after working six minutes or less past their shift, Hall Decl. ¶¶ 25-26; after working less than one hour of overtime in one week, *id.* at ¶ 28; or after working through a one-hour lunch. *Id.* ¶ 27. Similarly, there is no evidence that any other municipal employees, in any other departments, offices, or agencies, received portions of their overtime wages months after those wages were earned.

DHS locations besides 33 Beaver Street") (alteration in original); *Racey v. Jay-Jay Cabaret, Inc.*, 2016 WL 3020933, at *4 (S.D.N.Y. May 23, 2016) ("[W]here a plaintiff bases an assertion of a common policy on observations of coworkers or conversations with them, he must provide a minimum level of detail regarding the contents of those conversations or observations.") (quoting *Reyes v. Nidaja, LLC*, 2015 WL 4622587, at *3 (S.D.N.Y. Aug. 3, 2015)). The Hall and Simantiras declarations therefore do not constitute "actual evidence of a factual nexus" between plaintiff's own experience and the experiences of employees in other job titles or other departments, as required to conditionally certify such a broad collective. *Murray*, 2017 WL 3531552, at *6 (quoting *Mata v. Foodbridge LLC*, 2015 WL 3457293, at *3 (S.D.N.Y. June 1, 2015)).

Third, plaintiff's reliance on the Agreement to provide the necessary factual nexus – extending to hundreds of thousands of municipal employees working a wide variety of jobs within multiple departments, offices, and agencies – is misplaced. As plaintiff concedes, nothing in the Agreement requires or authorizes the City to treat some of her working hours as "non-compensable," or to pay her overtime wages late. *See* Compl. ¶ 47 (distinguishing these two alleged violations from those committed "under the terms of the Citywide Agreement"); Pl. Mem. at 5 (arguing that defendant denies plaintiff and other employees overtime wages "in several ways," only "some of which" are "outlined in the Citywide Agreement"); *id.* at 15 (conceding that the Agreement is "silent" as to plaintiff's non-compensable hours claim). Thus, plaintiff cannot rely on the Agreement to show that the City applies the same non-compensable hours policy to employees other than Construction Project Managers, in departments other than HPD, or that it fails to pay other employees' overtime wages "as soon after the regular pay period as is practicable." 29 C.F.R. § 778.106.

In her reply brief, plaintiff argues that her "allegations that Defendant fails to pay wages on time and treats compensable work as non-compensable are confirmed by documentary evidence." Pl. Reply Mem. at 2. But the only documents she has submitted, other than the Agreement, are her own pay records. As to her non-compensable hours claim and her late payment claim, therefore, plaintiff has failed to satisfy even her "minimal" burden, *Damassia*, 2006 WL 2853971, at *3, of showing that "'similarly situated' plaintiffs do in fact exist" outside of her own job title and department. *Myers*, 624 F.3d at 555.

The Agreement does speak to plaintiff's compensatory time claim. What the Agreement says, however, is that for non-exempt employees like plaintiff, both ordered involuntary overtime and authorized voluntary overtime "shall be" compensated, either in cash or in compensatory time, at the rate of time-and-a-half. Ag. art. IV §§ 3(a), 4(b). Since the compensatory time practices of which she complains *contravene* the express dictate of the Agreement, she cannot rely on that Agreement to show that the same practices are applied to other City employees in other job titles or departments.

Finally, I note that even in cases where the challenged pay practices are evidenced by a written policy, the courts are reluctant to certify an expansive collective, extending to multiple job titles or locations, in the absence of evidence showing that the policy is actually implemented outside of the named plaintiff's own job title or location. For example, in *Flood*, upon which plaintiff relies, *see* Pl. Mem. at 15, the named plaintiffs demonstrated the required factual nexus by submitting the employer's written policies *and* six declarations that contained "substantially similar allegations" of "unlawful policies across eight different T.G.I. Friday's restaurants in four states," *Flood*, 2015 WL 260436, at *2, and further demonstrated that managers actually applied uniform policies, with the help of defendant's centralized "Support Center," which both

"develop[ed] and enforce[d] company-wide policies and practices." *Id.* at *3. And in *Lassen v. Hoyt Livery Inc.*, 2014 WL 4638860 (D. Conn. Sept. 17, 2014), also cited by plaintiff, *see* Pl. Mem. at 15-16, the court was presented with three declarations attesting to the implementation of the employer's pay plan, *Lassen*, 2014 WL 4638860, at *4-5, and the defendant "readily concede[d] that all limousine drivers at Hoyt Livery had the same job duties and were compensated under the same commission-based system." *Id.* at *5.

Here, plaintiff has not identified a single employee, other than Construction Project Managers at HPD, who was affected by any of the policies that she seeks to challenge, whether or not those policies are authorized by the Agreement. Consequently, the collective will be limited to individuals who are or have been Construction Project Managers at HPD since December 2, 2019, that is, three years before the date on which this action was filed. *See* 29 U.S.C. § 255(a) (statute of limitations for claims alleging willful FLSA violations is three years).

**D.   Production of Potential Opt-In Plaintiff Information**

Plaintiff requests an order directing defendant to "provide the names, last known addresses, telephone numbers (home and mobile), email addresses, and dates of employment of all employees for a period of three years prior to the filing of the Complaint, in a computer-readable list." Pl. Mem. at 19.

Courts in this Circuit "routinely grant . . . motions to compel production of the names and addresses of potentially similarly situated employees who may wish to 'opt-in' to a collective action" following conditional certification. *Anglada v. Linens 'N Things, Inc.*, 2007 WL 1552511, at *7 (S.D.N.Y. Apr. 26, 2007) (collecting cases), *report and recommendation adopted*, Order (Dkt. 38), No. 06-CV-12901 (S.D.N.Y. May 29, 2007); *accord Cortes*, 2015 WL 7076009, at *4. Moreover, it is by now fairly clear that telephone numbers and email addresses often permit a more

25

efficient means of providing notice than mailing addresses alone, while minimally intruding on the employees' privacy. *See*, *e.g.*, *Racey*, 2016 WL 3020933, at *10 (ordering defendants to provide "a list of the names, addresses, telephone numbers, email addresses, and dates of employment for potential class members"). Additionally, courts commonly require the employer to disclose the potential collective members' dates of employment. *E.g.*, *Hernandez v. NGM Mgmt. Grp. LLC*, 2013 WL 5303766, at *5 (S.D.N.Y. Sept. 20, 2013) (ordering defendants to produce "a computer-readable list of the names, addresses, compensation rates, telephone numbers, and dates of employment" for all potential opt-in plaintiffs).

Defendant will therefore be required to provide a list, in computer-readable format, of the names, last known mailing addresses, email addresses, mobile telephone numbers, and dates of employment of all City employees who worked as Construction Project Managers at HPD on or after December 2, 2019. Home telephone numbers need not be provided.

### E.   Content and Distribution of the Notice

"At the conditional certification stage, the district court monitors both the drafting and the distribution of the Notice of Pendency to ensure timeliness and correctness, and courts have 'broad discretion' over the details of the Notice." *Guevara v. Fine & Rare Operations, LLC*, 2022 WL 103376, at *9 (S.D.N.Y. Jan. 10, 2022) (quoting *Garcia Ramos v. DNC Food Serv. Corp.*, 2020 WL 2832776, at *8 (S.D.N.Y. June 1, 2020)). In this case, the corrected proposed Notice of Pendency (with attached Consent to Join) (Dkt. 29-2), Email Notice (Dkt. 29-3), Text Message Notice (Dkt. 29-4), and Workplace Notice (Dkt. 29-5) will all require revision to conform to the scope of the collective conditionally certified by the Court.

In evaluating the content of an FLSA notice, a court should strive to ensure that potential opt-in plaintiffs receive "accurate and timely notice concerning the pendency of the collective

action, so that [they] can make informed decisions about whether to participate." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011) (quoting *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 323 (S.D.N.Y. 2007)). To that end, an FLSA collective notice generally should contain:

> a description of some or all of the following: (1) the purpose of the notice; (2) the nature of the lawsuit filed and the relief being sought; (3) the proposed class composition; (4) the legal effect of joining the lawsuit; (5) the fact that the court has not taken any position regarding the merits of the lawsuit; (6) how to join the lawsuit; (7) the purely voluntary nature of the decision and the legal effect of not joining the lawsuit; (8) the prohibition against retaliation; and (9) the relevant contact information for any inquiries.

*Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 566 (S.D.N.Y. 2012) (citation omitted). Courts in this District have also held that the notice should include a warning that opt-in plaintiffs may be required to provide information, appear for deposition, or testify in court. *See id.* at 567 (modifying proposed notice to explain such a possibility); *Pettenato*, 425 F. Supp. 3d at 284 (directing plaintiffs to include language which "appropriately advises potential plaintiffs about their potential litigation obligations"); *Jackson*, 298 F.R.D. at 170 ("The notice does not, however, advise potential plaintiffs that they may be required to provide information, appear for a deposition, or testify if they opt in. Because this information will aid potential plaintiffs in determining whether they would like to opt in, the Court directs Plaintiff to add a provision to the notice containing such information.").

Apart from the scope of the described collective, the City objects to the language of plaintiff's proposed Notice of Pendency in that it "neither conveys that Defendant maintains that all employees were paid appropriate and lawfully, nor is the collective made aware that it has not been established that any of the employees encompassed in the complaint were paid incorrectly." Def. Mem. at 13 (citing *Enriquez v. Cherry Hill Mkt. Corp.*, 2012 WL 440691, at *4 (E.D.N.Y. Feb. 10, 2012)). Defendant proposes to cure this deficiency with the following language:

"**Defendant plans to request that the Court decertify the collective action as soon as possible and/or dismiss the lawsuit, as they have the right to do.**" *Id.* (emphasis in original). However, this language goes well beyond what is necessary to convey "that Defendant maintains that all employees were paid appropriately or lawfully." Moreover, I agree with plaintiff that "[i]ncluding an explanation about a defendant's plans to decertify the collective is confusing and premature at this stage." Pl. Reply Mem. at 10 (quoting *Pierre*, 2022 WL 4482295, at *9); *see also Drayton v. City of New York*, 2020 WL 6465911, at *5 (S.D.N.Y. Nov. 3, 2020) (rejecting identical language because "[t]his sentence is an unnecessary recitation of Defendants' litigation tactics and serves no purpose vis-à-vis notice to the putative members of the collective, other than perhaps to seek to discourage them from opting into this case (which is an improper purpose)").

Plaintiff's proposed Notice of Pendency contains most of the required content. However, it does not make clear that this Court "has not taken any position regarding the merits of [this] lawsuit," *Salomon*, 847 F. Supp. 2d at 566, and it fails to warn potential opt-in plaintiffs about the litigation responsibilities that may come with opting in to the collective. The Court therefore directs the parties to revise the proposed notice to include language which appropriately: (1) notifies potential opt-ins plaintiffs that the Court has not taken a position regarding the merits of this action; (2) advises them about their potential litigation obligations; and (3) is otherwise consistent with this Memorandum and Order.

Finally, the Court authorizes plaintiff's counsel to disseminate the Notice of Pendency, Email Notice, and Text Notice, as plaintiff requests, Pl. Mem. at 17-18, once the requisite revisions are approved by the Court. However, to protect potential collective members from undue annoyance, counsel shall not contact any individual more than twice during the 60-day opt-in period via any one channel of communication, *see Guevara*, 2022 WL 103376, at *11, or more

than four times in total. Once the revisions have been approved by the Court, defendant will also be required to post the Notice of Pendency (and the Workplace Notice) in a location easily accessible to Construction Project Managers at HPD.

**F.      Equitable Tolling**

Ordinarily, the statute of limitations on an FLSA claim "continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form opting into the suit." *Whitehorn*, 767 F. Supp. 2d at 449; *see also* 29 U.S.C. § 256(a). In a collective action, equitable tolling of the statute of limitations may be warranted to avoid "inequitable circumstances" where individual plaintiffs have acted with "reasonable diligence in pursuing their claims," but where, due to the passage of time between the filing of the action and the dissemination of a notice of pendency, "a substantial number of class members may now be time-barred" through no fault of counsel or the named plaintiff. *Jackson*, 298 F.R.D. at 170. In this district, some courts "have found that the delay in ruling on a motion for conditional approval, coupled with the plaintiffs' diligence and avoiding prejudice to potential plaintiffs, is enough to grant equitable tolling." *Guzman v. Three Amigos SJL Inc.*, 117 F. Supp. 3d 516, 528 (S.D.N.Y. 2015) (citing *Flood*, 2015 WL 260436, at *6; *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012)). "While plaintiffs wishing to pursue their rights cannot sit on them indefinitely, those whose putative class representatives and their counsel are diligently and timely pursuing the claims should also not be penalized due to the courts' heavy dockets and understandable delays in rulings." *McGlone*, 867 F. Supp. 2d at 445.

Plaintiff requests equitable tolling from February 1, 2023 (the date she filed the instant motion) through "the close of any Court-ordered opt-in period." Pl. Mem. at 21. Defendant objects to any equitable tolling, on the ground that plaintiff "has not set forth the 'extraordinary

circumstances' that would warrant a tolling of the statute of limitations in this matter," arguing instead that it is plaintiff's counsel that "does not [want to] risk losing any potential clients." Def. Mem. at 11. In reply, plaintiff complains that the inevitable delay caused by the "time required for a court to rule on a motion, such as one for certification," has been "exacerbated by the City through its two-month extension of time to respond to the Complaint and one-month extension of time to oppose the instant motion." Pl. Reply Mem. at 9.

Here, as in *Jackson*, "Plaintiff moved for conditional certification shortly after filing [her] complaint," 298 F.R.D. at 170, and (although the City did not delay unreasonably in filing its opposition papers), the motion has now been fully-briefed for more than six months. The potential opt-in plaintiffs are therefore at some risk, through no fault of their own, that their FLSA claims could be time-barred, in whole or in part, before they act on the Notice of Pendency. The Court will therefore toll the statute of limitations. *Cf. Guevara*, 2022 WL 103376, at *11 (denying tolling request where plaintiffs did not make their certification motion for more than a year after filing suit, and where the court ruled on that motion only three and a half months after it became fully briefed). Plaintiff's proposed tolling window, however, is unduly long, as it would put potential opt-in plaintiffs in a better position than they would have been in if the Court had decided the certification motion the moment the reply papers were filed. Tolling the limitations period from February 1, 2023, through the date of this Memorandum and Order – a period of almost eight months – more than adequately remedies any prejudice that may have been caused by court delay.

## III.   CONCLUSION

For the foregoing reasons, plaintiff's motion for conditional certification (Dkt. 14) is GRANTED IN PART, as to plaintiff's compensatory time, non-compensable hours, and late payment claims, and as to a collective comprising all Construction Project Managers employed at

the New York City Department of Housing Preservation and Development on or after December

2, 2019, and otherwise DENIED.

No later than two weeks from the date of this Memorandum and Order:

1.    Defendant shall produce a computer-readable list containing the names, last known mailing addresses, email addresses, mobile telephone numbers, and dates of employment of all Construction Project Managers employed at the New York City Department of Housing Preservation and Development on or after December 2, 2019; and

2.    The parties shall, after meeting and conferring, prepare and submit to the Court, for its approval, a revised form of the Notice of Pendency (with attached Consent to Join), Email Notice, Text Message Notice, and Workplace Notice, incorporating the Court's rulings. If the parties are unable to reach a complete agreement, their cover letter must: (a) confirm that the parties met and conferred in good faith; (b) identify the precise issues on which disagreement remains; and (c) succinctly set forth each side's position on those issues.

The Clerk of Court is respectfully directed to close the motion at Dkt. 14.

Dated: New York, New York
        September 28, 2023                    **SO ORDERED.**

                                             **BARBARA MOSES**
                                             **United States Magistrate Judge**